**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SENA LONDON,
Plaintiff,
-against-
SONY MUSIC PUBLISHING (US) LLC,
Defendant.
Case No. 25-cv-06647 (VSB)(RFT)

**PLAINTIFF'S SUPPLEMENTAL FILING**
**ADDRESSING DEFENDANT'S EXHIBIT A**

Plaintiff Sena London, proceeding pro se, respectfully submits this supplemental filing in further opposition to Defendant's motion to dismiss the Second Amended Complaint ("SAC"). Plaintiff submits this filing consistent with the Court's August 7, 2026 Order, which provides that Defendants need not respond to filings made by Plaintiff other than his opposition to the motion to dismiss, but that whether or not Defendants file a response to any such extra filings by Plaintiff, the Court expects to consider his filings." ECF No. 63 ¶ 4.

This filing addresses **Exhibit A** to the Declaration of Imani D. Gunn (ECF No. 65-1) ("Exhibit A") and asks the Court to treat as the operative record of the August 5, 2025 Workday communication described in SAC ¶¶ 55, 61, and 118. As set forth below, Exhibit A does not meet the standard Defendant itself invokes for the Court's consideration of matters outside the four corners of the SAC, lacks adequate foundation, and, even if considered, does not resolve the disputed factual issues Defendant offers it to resolve.

## **I. Legal Standard: The Court May Consider Exhibit A Only If It Is Integral to, and Relied Upon In, the SAC**

Defendant asks the Court to consider Exhibit A as "incorporated by reference" and "integral" to the SAC, citing Islam v. Steiner, 822 F. Supp. 3d 407, 417 (S.D.N.Y. 2026), which in turn quotes L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011). Def. Mem. at 4 n.2. Under that authority, a document is "incorporated by reference" only where the complaint "explicitly refers to and relies upon" it, and a document is "integral" to the complaint only where the plaintiff had "actual notice" of it and "relied upon [it] in framing the complaint." Islam, 822 F. Supp. 3d at 417 (quoting L-7 Designs, 647 F.3d at 422). Even where a document meets that test, the Court "need not accept the plaintiff's description of its contents, but may look to the document itself", a principle that presumes the document is properly before the Court in the first place. Id. (quoting Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005)).

This standard exists precisely so that a defendant cannot short-circuit Rule 8 by introducing its own extrinsic evidence to contest facts the complaint alleges. A court may not use a Rule 12(b)(6) motion to resolve disputed facts or credibility. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Nor may a defendant use its own interpretation of a document to defeat otherwise plausible allegations. Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

## **II. Exhibit A Does Not Satisfy the Standard Defendant Invokes**

Applying Defendant's own authority defeats Defendant's own argument. The SAC does not attach, quote, describe, or otherwise refer to Exhibit A. The SAC instead alleges a materially different document: an automated Workday communication that Plaintiff recalls as bearing the subject line "You Are Terminated." SAC ¶¶ 55, 61, 118. Plaintiff continues to maintain, consistent with those pleaded allegations, that he recalls receiving that communication. Plaintiff does not

recall Exhibit A, and the SAC was not drafted with reference to it; Plaintiff therefore did not "rely upon" Exhibit A "in framing the complaint" within the meaning of Islam and L-7 Designs. To the contrary, the SAC's operative allegations are premised on Plaintiff's own recollection of a communication that differs from the one Defendant now offers.

A document whose very existence and content the complaint disputes cannot simultaneously be the document the complaint is deemed to have relied upon. Defendant cannot satisfy the actual-notice-and-reliance requirement of its own cited authority by producing, for the first time in its motion papers, a document that contradicts rather than confirms what the SAC describes. On a motion to dismiss, the SAC's well-pleaded factual allegations, including Plaintiff's allegation that he received a communication bearing the subject line "You Are Terminated," must be accepted as true. Defendant cannot use an extrinsic document produced in its own motion papers to contradict that allegation and ask the Court to resolve the resulting factual dispute in Defendant's favor. A court may not use a Rule 12(b)(6) motion to resolve disputed facts or credibility. Chambers, 282 F.3d at 152. Exhibit A accordingly does not qualify as incorporated by reference or integral to the SAC, and the Court should decline to consider its contents on this motion.

Nor does Exhibit A establish that it is the only Workday-generated communication transmitted to Plaintiff's account on August 5, 2025. The Gunn Declaration attests only that Exhibit A is "a true and correct copy of an email sent to Plaintiff Sena London on August 5, 2025"; it does not attest that Exhibit A is the sole such communication, and Defendant's motion papers do not otherwise represent that a search was conducted to confirm completeness. Whether a second, different Workday communication was also transmitted to Plaintiff that day, as the SAC alleges, is a factual question Exhibit A does not resolve.

Plaintiff acknowledges that Exhibit A does not bear the subject line alleged in the SAC. Should the Court determine that Exhibit A is in fact the communication referenced in SAC ¶¶ 55, 61, and 118, Plaintiff does not ask the Court to treat his description of that subject line as controlling over the produced document. Plaintiff disputes, however, Defendant's broader contention that Exhibit A conclusively establishes that no offboarding or separation action was initiated with respect to Plaintiff on August 5, 2025. Exhibit A's own content, directed at an employee who is "leaving" and approaching a "last day," is, at minimum, consistent with such an action having been initiated that day, regardless of the precise subject line under which it was transmitted. Plaintiff's position therefore does not rise or fall on the resolution of the subject-line dispute alone.

## III. Exhibit A Lacks Adequate Authentication and Foundation

Independent of the integral-document question, Exhibit A is not properly authenticated for the purpose Defendant offers it. See Fed. R. Evid. 901(a) (proponent must produce evidence "sufficient to support a finding that the item is what the proponent claims it is"). The Gunn **Declaration is executed by outside litigation counsel, not by a Sony Music Publishing records custodian, Workday administrator, or IT employee with personal knowledge of how the exhibit was retrieved, whether it was pulled from Plaintiff's mailbox or from Defendant's own servers, or whether the message headers, metadata, or send log were reviewed for completeness or alteration**. The declaration attests only that Exhibit A is "a true and correct copy of an email sent to Plaintiff Sena London on August 5, 2025**"; it does not attest that Exhibit A is the only such email, that it is unaltered, or that Defendant's underlying Workday and email-server records were searched to confirm completeness**. To the extent Defendant intends Exhibit A to be treated as a business record, no foundation has been offered under Fed. R. Evid.

803(6), which requires a showing that the record was made at or near the time of the event by someone with knowledge, kept in the course of a regularly conducted activity, and that making such a record was a regular practice, none of which the declaration addresses.

## IV. Even If Considered, Exhibit A Does Not Resolve the Disputed Facts It Is Offered to Resolve

### A. Exhibit A is silent on the conduct the SAC challenges

Even accepted at full face value, **Exhibit A contains no reference to the badge deactivation, the Restricted Access designation**, **the direction to Corporate Security**, or the **distribution of Plaintiff's photograph described in SAC** ¶¶ 57-65. Exhibit A uses only **generic separation language ("leaving," "before your last day," "your separation"**) and provides administrative instructions concerning an exit survey, expense reports, and return of equipment. It does not disclose to Plaintiff, and does not purport to explain, any of the security measures implemented that same day.

### B. Exhibit A's own language is in tension with Defendant's contemporaneous representation to Plaintiff.

SAC ¶ 54 alleges that, on the evening of August 5, 2025, Defendant separately represented to Plaintiff that his request for a full-remote accommodation had been reviewed and approved, and that Plaintiff was "expected to work fully remote." Exhibit A, sent the same evening, instead states: "We are sorry to learn that you will be leaving Sony Music Publishing," and refers throughout to Plaintiff's "last day," his "separation," and steps to complete "before you leave." Plaintiff does not contend that an offboarding communication and a remote-work accommodation are inherently incompatible, as an employer may transmit advance separation instructions before a scheduled final day**. Exhibit A does not, however, conclusively establish whether Plaintiff's separation remained scheduled for the fellowship's original end date of approximately August 14-15,**

**2025**, whether an earlier separation entry had instead been made in Defendant's systems, or why Plaintiff's physical access was revoked effective 7:00 p.m. that same evening while he was contemporaneously informed that he would continue the fellowship remotely through its conclusion. These are factual questions that cannot be resolved in Defendant's favor on a motion to dismiss.

**C. Exhibit A does not establish that it is the only Workday communication Plaintiff received that day.**

As set forth in Sections II and III above, the Gunn Declaration identifies Exhibit A as "an email" sent to Plaintiff on August 5, 2025, but does not state that it was the only automated Workday communication sent to Plaintiff's account that day. Accordingly, Exhibit A may establish the contents of the attached message, but it does not conclusively establish the absence of any other system-generated communication or entry, including the communication alleged in SAC ¶¶ 55, 61, and 118. Whether Exhibit A is complete, and whether it is consistent with Defendant's own Workday audit trail and email server records, are matters within Defendant's exclusive possession and are not properly resolved on the present record.

**D. The timing and sequence of the automated communication warrant discovery, not a finding in Defendant's favor.**

Plaintiff further alleges, to the best of his recollection, that the Workday communication referenced in SAC ¶¶ 55, 61, and 118, which Plaintiff recalls bearing a subject line referencing his termination, was transmitted earlier that day, at approximately 2:00 p.m. to 4:00 p.m., before Defendant represented to Plaintiff, near 7:00 p.m. that evening, that his remote-work request had been approved. See SAC ¶ 54. Plaintiff acknowledges that his recollection of the precise time is approximate. If accurate, however, this sequence would mean that Defendant's evening representation approving Plaintiff's accommodation came after, not before, an earlier

communication indicating that Plaintiff's employment had already been terminated, the reverse of the sequence Defendant's motion assumes. **The actual transmission time of that communication, as reflected in Defendant's own Workday and email-server logs, is a discrete and readily discoverable fact that Defendant, not Plaintiff, is in a position to establish**.

Plaintiff further recalls, to the best of his recollection, that the body of that earlier communication was substantially similar in form to the administrative offboarding content reflected in Exhibit A. Plaintiff does not contend that the earlier communication and Exhibit A were the same message; to the contrary, Plaintiff's recollection is consistent with two separate transmissions of a similar automated Workday offboarding template at different times that day, potentially reflecting two separate entries made to Plaintiff's status in Defendant's systems. Whether Defendant's Workday system in fact generated two such communications that day, and if so, what triggered each, are discrete and readily discoverable facts within Defendant's exclusive possession.

The **Restricted Access notice** attached to Plaintiff's opposition states that Plaintiff's badge access was deactivated "as of **7pm** est 8/5/2025." **Exhibit A** reflects that it was transmitted at **7:18:35 PM** the **same evening, approximately eighteen minutes later**. Plaintiff alleges, upon information and belief, that this proximity is consistent with **both actions having been triggered by the same entry made in Defendant's systems that afternoon or evening**, and **that discovery into Defendant's Workday audit logs is necessary to determine what change, if any, was entered and by whom**.

Plaintiff further notes that the **fellowship was scheduled to run through approximately August 14-15, 2025.** See SAC ¶ 23. Exhibit A, an automated "leaving"/offboarding

communication, **was transmitted more than a week before that scheduled end date**. This **timing is not self-evidently consistent with a routine**, **previously scheduled offboarding process for a program that had not yet concluded**, and instead **is consistent with Plaintiff's allegation that some change to his status was entered in Defendant's systems on August 5, 2025**.

## <u>V. Conclusion</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court decline to consider Exhibit A in connection with the pending motion to dismiss because it is neither incorporated by reference nor integral to the SAC under the standard Defendant itself invokes, and because it lacks adequate authentication. In the alternative, should the Court consider Exhibit A, Plaintiff respectfully submits that: (1) doing so presents matters outside the pleadings that should be addressed under Fed. R. Civ. P. 12(d), with a reasonable opportunity for Plaintiff to obtain and present the underlying Workday and email-server records before any disputed fact is resolved; and (2) even on its face, Exhibit A does not resolve, and in several respects corroborates, the SAC's allegations for the reasons set forth in Section IV above. As **Plaintiff has previously advised** the Court, **Plaintiff remains concerned about the risk of loss of relevant electronic records** in this matter, as reflected in Plaintiff's previous filings in this action. **Defendant has not represented, in the Gunn Declaration or otherwise, that Exhibit A is the only Workday-generated communication sent to Plaintiff's account on August 5, 2025**, and Plaintiff reserves the right to raise preservation and related discovery issues through the Court's ordinary procedures if and when discovery proceeds.

Plaintiff continues to request that the Court address the matters raised in this filing, and in Plaintiff's other submissions in this action, constructively and in the interest of a full and fair record.

## CERTIFICATION REGARDING THE USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Consistent with Judge Broderick's Individual Rule 4.J, Plaintiff discloses that a generative artificial-intelligence tool assisted with the organization, editing, and preparation of this filing. All factual information provided originated from Plaintiff's firsthand experiences, evidence and personal recollection. Plaintiff personally reviewed the completed filing and verified each citation to the record, quotation, and legal authority. Plaintiff submits this filing subject to the certifications and obligations imposed by Federal Rule of Civil Procedure 11.

Dated: 09/18/2026
Respectfully submitted,

Sena London
Plaintiff, Pro Se
P.O. Box 15342
Beverly Hills, CA 90209

# Exhibit A

**Caution : This email originated from outside of Sony.**

Do not click links or open any attachments unless you recognize the sender and know the content is safe. Please report phishing if unsure.

**From:** SonyWorkdayDoNotReply@sony.com <sonyglobal@myworkday.com>
**Sent on:** Tuesday, August 5, 2025 7:18:35 PM
**To:** London, Sena <Sena.London@sonymusicpub.com>
**Subject:** Before you Leave SMP

SONY MUSIC PUBLISHING

Dear Sena,

We are sorry to learn that you will be leaving Sony Music Publishing. We wish you well in your future endeavors!

This email provides guidance on actions you should take before you leave.

- **Exit Survey:** We are always looking for ways to develop and improve the workplace for current and future employees and would like to solicit your thoughts. Please complete the Exit Survey before your last day. A task should be in your Workday inbox.
- **Time & Attendance:** Ensure your time & attendance record is up to date in Workday (Hours Worked/FTO).
- **Expense Reports:** Ensure business expense claims are submitted via Concur and approved. If you have an outstanding Amex balance, it should be paid in full by your last day of employment. Please contact Finance (accountingquestions@sonymusicpub.com) with any questions.
- **Return All Company Property:** A member of our IT department will contact you regarding the return of company equipment (laptop, mobile device, etc.). All other company property should be given to your local facilities contact (ID badge, AMEX, etc.) on your last day in office.
- **Exit Meeting:** Your People Experience Business Partner will schedule an exit meeting to review the aforementioned items and answer any outstanding questions.

Additionally, please review the helpful information below regarding your separation.

1. **FAQ-Leaving SMP:** Details key information regarding your benefits, final paycheck, etc.
2. **MyADP Direct Registration Instructions:** Instructions for accessing payroll information such as check stubs/ W2's after your last day.

Thank you in advance for taking the time to complete the survey. We value your opinion and look forward to your feedback.

Should you have any questions, please reach out to your People Experience Business Partner.

**-Your People Experience Team**

# Exhibit B

Case 1:25-cv-06647-VSB-RFT Document 40 Filed 10/20/25 Page 15 of 25

Restricted Access Notice and Security Escalation The internal notice reproduced below, titled "SENA LONDON Restricted Access: 8/5/2025 with different pictures taken without consent," was circulated while Plaintiff remained an active employee of SMP and continued to receive pay through the official end of the fellowship. It ordered that Plaintiff's badge be deactivated at 7:00 p.m. EST on August 5, 2025, and that "Sean Conry or John DiCaprio be contacted if entry is attempted." Both Conry and DiCaprio are senior corporate-security executives of SCA. The directive elevated an intern's physical presence to a matter of security escalation, requiring the involvement of the parent company's top security command.


SENA LONDON Restricted Access: 8/5/2025

- Badge access has deactivated as of 7pm est 8/5/2025 (Intern Badge).
- SENA has been added to the restricted access list. Please call Sean Conry or John DiCaprio if entry is attempted.







## About

An accomplished senior security executive with proven expertise in all areas of corporate and government security planning and operations. Extensive experience in corporate security management including security analysis, budgeting, crisis management, business continuity, public/private relationship building, special event security planning, access control systems design and integration, investigations, executive protection, contract guard services. Developed in-depth subject matter expertise in the areas of emergency management, facilities/infrastructure protection, and public safety as the Chief of Security and Intelligence Operations at the NYC Office of Emergency Management. Investigative experience across a variety of disciplines. Proficient in Investment and Financial institution security processes. Established contacts and professional relationships with local, state, and federal law enforcement agencies.

# Exhibit C

## Exhibit C: Workday Administrator manual page 6-7

Source: Workday, FAQ: Terminations, **https://doc.workday.com/admin-guide/en-us/human-capital-management/staffing/hire-and-terminate/bwz1497990098885.html?toc=4.13.15**

(last visited Sept. 20, 2026)

**Can terminated employees receive payments through Workday Payroll?**

Yes, if you configure the run category associated with the employee's pay group to process terminated employees who either:

- Are on salary continuance.
- Have payroll input.
- Have a one-time payment or a bonus payment from Workday Compensation.

**Can a nonpayroll administrator end ongoing payroll inputs for terminated workers?**

Yes. Configure the *End Payroll Inputs* business process on the *Termination* business process.

**Can a nonpayroll administrator terminate a worker and pay them on the day you terminate them or any other day?**

Yes. Configure the *On Demand Event* business process on the *Termination* business process.

# Exhibit D

**Administrator Guide**



Human Capital Management Staffing Hire and Terminate

Last Updated: 2026-06-12

**Download PDF**

# FAQ: Terminations


- What is the difference between terminating an employee and ending a contingent worker's contract?
- What time of day does a termination take effect?
- How do I handle organization assignments for terminated workers?
- How can I prevent a terminated worker from accessing and submitting certain tasks in My Tasks?
- How do I enable terminated workers to access their personal, compensation, and benefits information in Workday?
- How do I grant bonuses to terminated employees?
- Which domains provide access to terminated workers?
- How can I view terminated workers in active organizations?
- Which data sources return terminated workers?
- Why do reports display different addresses for terminated workers?
- Which email address does Workday use for terminated workers?
- What if a performance review is in progress for a terminated worker?
- Can terminated employees receive payments through Workday Payroll?
- Can a nonpayroll administrator end ongoing payroll inputs for terminated workers?
- Can a nonpayroll administrator terminate a worker and pay them on the day you terminate them or any other day?
- What if the employee has an active collective agreement assigned?
- How can I prevent workers scheduled for involuntary termination from requesting time off or leave beyond their final work date?


**What is the difference between terminating an employee and ending a contingent worker's contract?**

The *Termination* and *End Contingent Worker Contract* business processes are similar, except for the steps related to benefits and compensation. The *Termination* business process can include:

- *Change Benefit Elections*
- *Create Change Benefits Event*
- *Edit Service Dates*
- *Request One-Time Payment*
- *Review COBRA Eligibility*

The *End Contingent Worker Contract* business process only allows a *Create Change Order from Contract Contingent Worker* step. You can customize these 2 business processes to meet the needs of different organizations.

**What time of day does a termination take effect?**

Terminations are effective at the end of the termination date, based on the time zone of the position location.

**How do I handle organization assignments for terminated workers?**

You have several options:

- Keep terminated workers in their current, active organizations.
  - **Pros:** Role assignments and inheritance don't change.
  - **Cons:** Staffing reports include the terminated workers.
- Move terminated workers into a separate organization specifically for terminated workers.
  - **Pros:** Role assignments require less maintenance and inheritance is available. However, if you inactivate the organization later, role inheritance remains available if you keep the organization in the hierarchy.
  - **Cons:** You can't restrict access to specific terminated workers. Anyone who has permission to access the organization can access all of the terminated workers. Also, the organization is available for selection in prompts even though it's not a valid choice.
- Inactivate the organizations that terminated workers belong to. Inactive organizations remain in their respective hierarchies and inherited roles remain in the inactive organization. This behavior applies unless you explicitly select the **Remove from Hierarchy** option when inactivating an organization. The best way to ensure that you continue to have visibility into inactive organizations and to maintain role inheritance within them is to accept the default behavior (to keep inactive organizations within their associated hierarchies).

**How can I prevent a terminated worker from accessing and submitting certain tasks in My Tasks?**

For *Action* and non-*Action* step types, Workday recommends that you reassign tasks when the worker is no longer in their role. You can reassign their tasks by using the:

- *Auto-Manage Business Processes* service step.
- **Manage Business Processes for Worker** task.

For *Action* steps only, Workday displays **Action no longer available** when accessing the step in **My Tasks**. The worker might still be able to take action on other step types even though they no longer have the security permissions. Example: *To Do* steps.

**How do I enable terminated workers to access their personal, compensation, and benefits information in Workday?**

Assign the terminated workers to the *Terminee as Self* security group and add this group to the domains that control access to the tasks:

- *Landing Page - Home*
- *Self-Service: Contact Information*
- *Self-Service: Device Tokens*
- *Self-Service: Add Worker Documents*
- *Self-Service: Edit and Delete Worker Documents*
- *Self-Service: Emergency Contacts*
- *Self-Service: Government IDs*
- *Self-Service: Home Contact Information*
- *Self-Service: ID Information*
- *Self-Service: Legal Name*
- *Self-Service: Licenses*
- *Self-Service: Name*
- *Self-Service: Other IDs*
- *Self-Service: Passports and Visas*
- *Self-Service: Payroll (My Payslips)*
- *Self-Service: Payroll (My Tax Documents) - USA*
- *Self-Service: Personal Data*
- *Self-Service: Personal Information*
- *Self-Service: Work Contact Information*

The primary domains are:

- *Self-Service: Benefits* or *Self Service: Benefits and Pay Hub* to access benefits information.
- *Self-Service: Compensation* to access compensation information.
- *Self-Service: Personal Information* to access personal information.

**How do I grant bonuses to terminated employees?**

You can select the **Include Employees Terminated During Process Period** check box on the **Initiate Compensation Review Process** task. Workday includes terminated employees subject to the rules configured on the bonus plan.

**Which domains provide access to terminated workers?**

You must be in a security group that has permission on the *Worker Data: Public Worker Reports* domain, which enables you to search for employees, and have permission on at least one of these additional domains:

- *Person Data: Birth Place*
- *Person Data: Emergency Contacts*

- *Person Data: Gender*
- *Person Data: Home Contact Information*
- *Person Data: ID Information*
- *Person Data: Military Status*
- *Person Data: Personal Information*
- *Self-Service: Benefit Elections*
- *Self-Service: Business Assets*
- *Self-Service: Compensation*
- *Self-Service: Credit Card*
- *Self-Service: Current Staffing Information*
- *Self-Service: Emergency Contacts*
- *Self-Service: Home Contact Information*

- *Worker Data: Business Assets*
- *Worker Data: Compensation by Organization*
- *Worker Data: Credit Card*
- *Worker Data: Current Staffing Information*
- *Worker Data: Leave of Absence*
- *Worker Data: Time Off (Time Off Balances)*

**How can I view terminated workers in active organizations?**

Inactive organizations automatically remain in any of their respective hierarchies and they maintain any inherited roles in the inactive organization. This behavior applies unless you explicitly select the **Remove from Hierarchy** option when inactivating an organization. The best way to maintain visibility and role inheritance in inactive organizations is to accept the default behavior, keeping them within their associated hierarchies.

If you select the **Remove from Hierarchy** option, then you must have a role in the inactive organization. You can assign all inherited roles directly when you inactivate an organization by selecting the **Keep All Role Assignments** check box. If an organization isn't part of a hierarchy, you can assign a superior to add it back to a hierarchy so that role inheritance is available.

**Which data sources return terminated workers?**

Some of the most common data sources returning terminated workers include:

- **All Active and Terminated Workers**
- **All Contingent Workers**
- **All Terminated Employees**
- **All Workers**
- **Terminations**

The **All Active and Terminated Workers**, **All Workers**, and **Terminations** data sources return both employees and contingent workers.

A key difference between these data sources is how they handle effective-dated information. In reports that don't have an effective date:

- The **All Active and Terminated Workers** data source returns data for terminated workers as of their last day of work. Use this data source to report on effective-dated position and compensation data.
- The **All Workers** and **All Contingent Workers** data sources include rows for terminated workers, but return blank fields for effective-dated information. Use these data sources to report on other information that isn't effective-dated, such as personal information.

Refer to the data source descriptions in Workday for additional information. The descriptions specify if the data sources return terminated workers.

**Why do reports display different addresses for terminated workers?**

The address depends on the report data source that you use:

- Reports using the **All Active and Terminated Workers** data source return the address that was effective as of the worker's termination date.
- Reports using the **All Workers** data source return the terminated worker's address as of the report date.

**Which email address does Workday use for terminated workers?**

Once the termination process is complete, Workday sends email messages to the worker's primary home email address. If there's no primary home email for the terminated worker, Workday will use these emails for the worker in this order:

- Work.
- Home.
- Business.

**What if a performance review is in progress for a terminated worker?**

Cancel the performance review:

1. As a related action on the worker, select **Talent > View Employee Reviews**.
2. Locate the review in the **In Progress** table, then select **Business Process > Cancel** from the related actions menu.

**Can terminated employees receive payments through Workday Payroll?**

Yes, if you configure the run category associated with the employee's pay group to process terminated employees who either:

- Are on salary continuance.
- Have payroll input.
- Have a one-time payment or a bonus payment from Workday Compensation.

**Can a nonpayroll administrator end ongoing payroll inputs for terminated workers?**

Yes. Configure the *End Payroll Inputs* business process on the *Termination* business process.

**Can a nonpayroll administrator terminate a worker and pay them on the day you terminate them or any other day?**

Yes. Configure the *On Demand Event* business process on the *Termination* business process.

**What if the employee has an active collective agreement assigned?**

You can configure the **End Collective Agreement Assignment** step on the *Termination* business process. Doing so ends any active collective agreement assignments without an end date during the termination.

**How can I prevent workers scheduled for involuntary termination from requesting time off or leave beyond their final work date?**

You can consider:

- Proactively preventing requests with an eligibility rule for Absence business processes if this meets your business requirements.
- Automatically removing invalid requests after termination.

  You can add the *Remove Invalid Time Off Entries After Termination* service step to your *Termination* business process. This step should be placed after the *Completion* step. It will automatically correct or rescind any approved time off entries that are no longer valid due to the termination. You can also configure a condition rule on this service step to have it run only for specific termination types, such as involuntary terminations. See Steps: Remove Invalid Time Off Entries After Termination.

## Related Information

- Concept: Pay for Terminated Workers
- Concept: Termination Impact
- Terminate Employees
- End Contingent Worker Contracts
- Initiate Compensation Review Processes
- Steps: Set Up Decentralized Processing for On-Demand Payments
- Steps: Set Up End Payroll Inputs for Terminated Workers
- 2021R1 What's New Post: End Ongoing Payroll Inputs for Terminated Workers ↗

< FAQ: How do I import worker IDs during a hire?

Troubleshooting: Configure Business Process Consolidated Template >

## Was this helpful?

Yes

No



© 2026

Workday, Inc. Confidential